FILED IN OPEN COURT
U.S.D.C ATLANTA

Date: Sep 10 2021

KEVIN P. WEIMER, Clerk

By: s/James Jarvis
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARK MELNICK | Criminal Information<br><br>No. 1:21-CR-300 |

THE UNITED STATES ATTORNEY CHARGES THAT:

## Count One
### (18 U.S.C. § 371 -- Conspiracy to Commit Wire Fraud and Securities Fraud)

1. Beginning no later than in or about October 2017 and continuing until in or about January 2020, the exact dates being unknown, in the Northern District of Georgia and elsewhere, the defendant, **MARK MELNICK**, and Bart Ross, Individual-1, Individual-3, Individual-4, and others known and unknown, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other to commit offenses against the United States, that is:

   a. securities fraud, that is, to willfully and knowingly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, and did (a) employ a device, scheme, and artifice to defraud; (b)

make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon others, in connection with the purchase and sale of said securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

b. wire fraud, that is, to knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as well as by omission of material facts, and for the purpose of executing such scheme and artifice and to obtain money and property, and with intent to defraud, cause wire communications to be transmitted in interstate commerce, in violation of Title 18, United States Code, 1343.

## Background

At all times relevant to this Information:

2. The United States Securities and Exchange Commission ("SEC") was an independent agency of the United States charged with enforcing the federal securities laws, which are designed to provide the investing public with full disclosure of all material facts regarding matters involving the offer, purchase, and sale of securities, among other things. These laws protect the investing public in the purchase of stock that is publicly distributed by maintaining fair and honest securities markets and eliminating manipulative practices that tend to distort the fair and just price of stock. The SEC regulated, among other things, the offers and sales of securities. For a company to offer or sell its securities to the public, federal securities laws, specifically section 5 of the Securities Act of 1933, required that the company first file a registration statement with the SEC or that the transaction be exempt from registration. The requirement of a registration statement was designed, in part, to protect the general investing public by requiring detailed disclosures about a company's actual operations and financial condition.

3. The Financial Industry Regulatory Authority, Inc. ("FINRA") was an industry organization representing persons and companies involved in the securities industry in the United States. It was a self-regulatory organization responsible for the regulation of its industry, with oversight from the SEC. FINRA licensed individuals and admitted firms to the industry, wrote rules to govern their behavior, examined them for regulatory compliance, and was

sanctioned by the SEC to discipline registered representatives and member firms that failed to comply with the federal securities laws and FINRA's rules and regulations.

4. Trillian was a proprietary multiprotocol instant messaging application created by Cerulean Studios, LLC. Trillian allowed users to connect with multiple instant messaging services, including Google Talk, Facebook Messenger, AOL Instant Messenger, and Yahoo! Messenger. The advantage of using Trillian is that a user does not need to be logged into separate applications to chat across multiple platforms.

5. A call option for stocks was, in substance, a contract that gave the option's owner the right, but not the obligation, to buy shares of the underlying stock at a set price per share, known as the option's strike price, on or before a set future date, known as the option's expiration date. Generally, the holder of a call option benefited when the price of the underlying stock increases. Short-term call options generally expire within a week.

6. Trade The News, TradeXchange, Benzinga, RANsquawk, and T3 Live, LLC are examples of "market subscription services." These subscription services disseminate market-related rumors and news.

7. **MARK MELNICK** resided in New Jersey and was a T3 Live Senior Trading Strategist and T3 Live contributor. **MELNICK** has been a professional day trader since approximately 1999. **MELNICK** operated a video feed on the T3 Live platform through which **MELNICK** provided real-time stock and options

trade ideas to **MELNICK's** subscribers during trading hours in a live, interactive trading room. **MELNICK** had a Trillian account.

8. Bart Ross resided in the Northern District of Georgia. Ross was previously registered with FINRA as a registered broker and employed at T3 Trading Group, LLC. Ross had a Trillian account.

9. Individual-1 was a day trader who resided in the Northern District of Georgia. Individual-1 had a Trillian account. The co-conspirators referred to Individual-1 as "the Pope."

10. Individual-3 resided in Florida and was registered with FINRA as a registered broker. Individual-3 was employed by Chimera Securities, an SEC-registered broker-dealer, from approximately August 2014 until August 2019. Individual-3 had been previously employed by T3 Trading, another SEC registered broker-dealer. Individual-3 had a Trillian account.

11. Individual-4 resided in Florida and was registered with FINRA as a registered broker. Individual-4 was employed by T3 Trading from approximately January 2011 until July 2019. Individual-4 had a Trillian account.

## Manner and Means of the Trading Scheme

12. Beginning no later than in or about October 2017 and continuing until in or about January 2020, the defendant, **MARK MELNICK**, and Ross, Individual-1, Individual-3, Individual-4, and others known and unknown, executed a scheme in which they traded securities, primarily short-term call options, in publicly traded companies (*e.g.*, Disney, Kellogg, Pacific Gas & Electric, and Yelp) based on materially false rumors about those companies that the conspirators had

5

generated and disseminated. These materially false rumors were intended to drive up the price of the securities (both the underlying stock and options).

13. Ross and the other co-conspirators drafted and generated a variety of false rumors about the publicly traded companies, such as fake rumors that a company was involved in an acquisition or spinoff, or that a prominent investor intended to make a sizeable investment in a company.

14. The conspirators communicated in a variety of ways, including using Trillian, Skype, telephone calls, and email. With respect to drafting and finalizing the materially false rumors, the conspirators communicated by exchanging electronic messages on Trillian.

15. **MELNICK** and Individual-1 would often discuss via Trillian chat exchanges, over Skype, and during telephone conversations whether a particular false rumor would be successful. **MELNICK** provided Individual-1 with a "technical evaluation" regarding a particular stock.

16. Once the rumor was formulated, Individual-1 was responsible for disseminating the rumor via Trillian to multiple accounts, which would in turn result in the materially false rumor being disseminated via one or more subscription services, including Trade The News, TradeXchange, and Benzinga, and via Twitter accounts.

17. Before Individual-1 disseminated the rumor, **MELNICK** and the other co-conspirators would acquire a position in the publicly traded company that was the subject of the materially false rumor. The co-conspirators typically purchased short-term call options before (sometimes just minutes or seconds before)

Individual-1 disseminated the rumor. The conspirators often (but not always) purchased short-term call options because the price of such options is more sensitive than the price of the underlying stock. Accordingly, it was possible for the conspirators to make greater percentage returns by trading short-term call options rather than the underlying stock.

18. The conspirators profited from their scheme by selling the options (or other securities) after they increased in price. **MELNICK** and the other conspirators typically began selling off their positions shortly after the rumor was disseminated (after the price of the option or underlying stock had increased).

19. After trading on the fraudulent rumors, **MELNICK** and the other conspirators would sometimes exchange Trillian messages discussing whether a given fraudulent rumor worked, *i.e.*, whether the conspirators traded profitably on the rumor.

20. **MELNICK** had an agreement with Individual-1 under which he would share a portion of his profits with Individual-1 from the above-described securities fraud scheme.

21. During the relevant period, **MELNICK** executed at least 102 trades consistent with the above-described securities fraud scheme, including executing trades on or about March 8, 2018 in Disney short-term call options, and on or about April 17, 2018 in Ben Franklin Resources short-term call options. In total, **MELNICK** earned at least $374,835 in profits from executing trades based on

materially false rumors that were generated and disseminated by the co-conspirators.

## Overt Acts

22. In furtherance of the conspiracy and to accomplish its objects and purpose, the defendant, **MARK MELNICK**, and the co-conspirators, committed and caused to be committed, in the Northern District of Georgia and elsewhere, at least the following overt acts, among others:

    a. On or about October 8, 2017, Individual-1 emailed Individual-4: "Anyway get trillian pro dint [sic] wait like all morons."

    b. In or about January 2018, **MELNICK** and Individual-1 engaged in a conversation over Skype in which they discussed whether trading on a materially false rumor relating to International Paper ("IP") would be successful. Specifically, Individual-1 was asking **MELNICK** for "technical analysis" about IP in assessing whether trading on a materially false rumor would "work."

    c. On or about March 7, 2018, between approximately 11:30 and 11:40 a.m., Ross sent Individual-4 a Trillian chat message with two similarly phrased Disney-related rumors: (1) "Walt Disney Co. has hired Goldman sachs (sic) to spin off ESPN and their theme parks. The deal will enhance shareholder value, and according to one analyst could leave (sic) to an eventual sale of the company. Price tags could fetch over $ 175 per share according to analysts"; and (2) "Walt Disney Co. (DIS) has reportedly hired Goldman Sachs in an effort to spin off

their ESPN unit and their theme parks. According to one analyst the break-up could exceed $175 per share, and an eventual sale of the company." This rumor relating to Disney, *i.e.*, that Disney purportedly hired Goldman Sachs to help spin off several assets, including ESPN and its theme, was materially false.

d. On or about March 7, 2018, at approximately 11:54 a.m., Ross sent Individual-4 a Trillian message advising him that he spoke with Individual-1 by phone and gave Individual-1 the Disney-related rumor. Individual-4 then asked to speak with Ross by telephone.

e. On or about March 8, 2018, at approximately 7:48 a.m., Ross sent Individual-4 the following Trillian message: "send me the Disney (sic) story." In response, Individual-4 sent Ross a third, slightly different version of the Disney-related rumor, which read: "According to sources, Walt Disney Co. (DIS) has reportedly hired Goldman Sachs to spin off their theme parks and ESPN. According to one analyst the break-up value could exceed $175 per share and may lead to an eventual sale of the company, unconfirmed." Ross replied to Individual-4, "doesn't read great," to which Individual-4 responded, "back to the drawing board."

f. On or about March 8, 2018, between approximately 8:10 a.m. and 9:52 a.m., Ross and Individual-4 exchanged multiple messages via Trillian in which they revised the false Disney rumor.

9

g. On or about March 8, 2018, during the time when Ross and Individual-4 were exchanging messages, Individual-1 sent Ross a Trillian message requesting that Ross call Individual-1.

h. On or about March 8, 2018, at approximately 9:53:14 a.m., Ross sent Individual-1 a Trillian message with the Disney-related rumor, which read, "Walt Disney Co. (DIS) has reportedl (sic) Sachs to spin off their theme parks and ESPN. According to one analyst the break-up value could exceed $155 per share and may lead to an eventual sale of the company."

i. Between on or about March 6, 2018 and on or about March 7, 2018, Ross purchased short-term call options in Disney.

j. On or about March 7, 2018, Individual-1 purchased short-term call options in Disney.

k. On or about March 7, 2018, Individual-3 purchased short-term call options and stock in Disney.

l. On or about March 7, 2018, Individual-4 purchased short-term call options in Disney.

m. On or about March 8, 2018, at approximately 9:57 a.m., Individual-1 purchased short-term call options in Disney.

n. On or about March 8, 2018, between approximately 9:57:35 a.m. and 9:57:38 a.m., **MELNICK** purchased short-term call options in Disney.

o. On or about March 8, 2018, between approximately 9:51:05 a.m. and 9:57:40 a.m., Individual-3 purchased short-term call options and stock in Disney.

p. On or about March 8, 2018, between approximately 9:56:23 a.m. and 9:57:37 a.m., Individual-4 purchased short-term call options and stock in Disney.

q. On or about March 8, 2018, at approximately 9:57:32 a.m., Individual-1 sent out the materially false rumor about Disney to multiple Trillian accounts, including Individual-3. Individual-1 sent out the rumor reading, "DIS Chatter hearing hired GS to spin off their theme parks and ESPN. According to one analyst the break-up fee value could exceed $155 per share and may lead to an eventual sale of the company, unconfirmed."

r. On or about March 8, 2018, at approximately 9:58:50 a.m., Benzinga Chat (BenzingaCharlie) posted "DIS spinoff chatter."

s. On or about March 8, 2018, at approximately 10:04:21 a.m., RANsquawk posted "RANsquawk sources note Disney (DIS) may be selling off ESPN and Theme Park assets 'unconfirmed.'"

t. On or about March 8, 2018, between approximately 9:58:30 a.m. and 10:29:01 a.m., Individual-1 sold Individual-1's position in Disney.

u. On or about March 8, 2018, between approximately 9:58:42 a.m. and 10:04:44 a.m., **MELNICK** sold **MELNICK**'s position in Disney.

v. On or about March 8, 2018, between approximately 9:57:58 a.m. and 10:23:08 a.m., Individual-3 sold Individual-3's position in Disney.

w. On or about March 8, 2018, between approximately 9:58:04 a.m. and 3:19 p.m., Individual-4 sold Individual-4's position in Disney.

x. On or about March 8, 2018, between approximately 10:02:31 a.m. and 10:03:40 a.m., Ross sold his position in Disney.

y. **MELNICK** and the other co-conspirators each profited by trading on the materially false rumor about Disney that was disseminated by Individual-1 on or about March 8, 2018.

z. On or about April 17, 2018, Ross and Individual-4 exchanged multiple Trillian chat messages about a materially false rumor involving Ben Franklin Resources. Ross and Individual-4 exchanged slightly different formulations (or drafts) of the rumor that BlackRock, Inc., a global investment firm based in New York, may make an offer to acquire Ben Franklin Resources.

aa. On or about April 18, 2018, at approximately 9:27:43 a.m., Ross sent Individual-4 via Trillian the following version of the materially false rumor about Ben Franklin Resources: "BlackRock (BLK) has offered to acquire Franklin Resources (BEN) ina (sic) cash transaction valuing the fund at $55 per share." Individual-4 replied via Trillian to Ross, in which Individual-4 acknowledged receiving the rumor.

12

bb. On or about April 18, 2018, at approximately 10:15 a.m., Individual-4 sent the materially false Ben Franklin Resources rumor back to Ross.

cc. On or about April 18, 2018, at approximately 10:23:28 a.m., Individual-3 sent the materially false rumor about Ben Franklin Resources to Individual-1.

dd. On or about April 18, 2018, between approximately 10:05:56 a.m. and 10:08:35 a.m., Ross purchased short-term call options in Ben Franklin Resources.

ee. On or about April 18, 2018, between approximately 10:25:34 a.m. and 10:25:35 a.m., Individual-1 purchased short-term call options in Ben Franklin Resources.

ff. On or about April 18, 2018, at approximately 10:26:10 a.m., **MELNICK** purchased short-term call options in Ben Franklin Resources.

gg. On or about April 18, 2018, between approximately 10:09:23 a.m. and 10:25:59 a.m., Individual-3 purchased short-term call options and stock in Ben Franklin Resources.

hh. On or about April 18, 2018, between approximately 10:09:23 a.m. and 10:26:23 a.m., Individual-4 purchased short-term call options and stock in Ben Franklin Resources.

ii. On or about April 18, 2018, at approximately 10:26:13 a.m., Individual-1 sent out the materially false rumor about Ben Franklin

Resources to multiple Trillian accounts. Individual-1 sent out the rumor reading: "BlackRock (BLK) has offered to acquire Franklin Resources (BEN) in a cash transaction valuing the fund at $55 per share (unconfirmed)."

jj. On or about April 18, 2018, at approximately 10:27:30 a.m., Benzinga Chat (BenzingaCharlie) posted "BLK BEN chatter."

kk. On or about April 18, 2018, at approximately 10:29:12 a.m., RANsquawk posted, "Takeover talks for Franklin Resources (BEN); Blackrock touted as a potential suitor for USD 55/shr; unconfirmed."

ll. On or about April 18, 2018, between approximately 10:26:49 a.m. and 10:30:02 a.m., Ross sold his position in Ben Franklin Resources.

mm. On or about April 18, 2018, between approximately 10:26:53 a.m. and 10:43:09 a.m., Individual-1 sold Individual-1's position in Ben Franklin Resources.

nn. On or about April 18, 2018, between approximately 10:26:51 a.m. and 10:28:02 a.m., **MELNICK** sold his position in Ben Franklin Resources.

oo. On or about April 18, 2018, between approximately 10:26:42 a.m. and 10:35:14 a.m., Individual-3 sold Individual-3's position in Ben Franklin Resources.

pp. On or about April 18, 2018, between approximately 10:26:59 a.m. and 2:18:36 p.m., Individual-4 sold Individual-4's position in Ben Franklin Resources.

   qq. **MELNICK** and the other co-conspirators each profited by trading on the materially false rumor about Ben Franklin Resources that was disseminated by Individual-1 on or about April 18, 2018.

All in violation of Title 18, United States Code, Section 371.

## Forfeiture Provision

23. Upon conviction of the offense alleged in Count One of the Information, the defendant, **MARK MELNICK**, shall forfeit to the United States of America Pursuant, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said violations, including, but not limited to, the following:

 (a) MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of Count One of the Information.

24. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

 a. cannot be located upon the exercise of due diligence;

 b. has been transferred or sold to, or deposited with, a third party;

 c. has been placed beyond the jurisdiction of the Court;

 d. has been substantially diminished in value; or

 e. has been commingled with other property which cannot be divided without undue complexity or difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

KURT R. ERSKINE
  Acting United States Attorney

ALEX R. SISTLA
  Assistant United States Attorney
Georgia Bar No. 845602

THOMAS J. KREPP
  Assistant United States Attorney
Georgia Bar No. 346781

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181